**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

BEST DEALS ON TV, INC., a California Corporation, *et al.*,

        Plaintiffs,

v.

MOHTASHIM NAVEED, an Individual, *et al.*,

        Defendants.

No. C 07-01610 SBA

**ORDER**

[Docket Nos. 111, 131]

**REQUEST BEFORE THE COURT**

Before the Court is a Motion to Dismiss Counterclaim for Failure to Prosecute and Failure to Comply with Court Orders; and Request to Enter Default against Certain Defendants and Counter-Claimants (the "Motion") [Docket No. 131]. Movants seek to dismiss a counter-claim under Federal Rule of Civil Procedure 41(b) and seek default judgment against four defendants/counter-claimants under Federal Rule of Civil Procedure 55. The Court finds this matter appropriate for resolution without a hearing under Federal Rule of Civil Procedure 78(b), and for the reasons discussed below, the Court GRANTS in part and DENIES in part the Motion. Specifically, the Court GRANTS the request to dismiss with prejudice the counter-claim under Rule 41(b), GRANTS the request to enter a default, but DENIES the request to enter a default judgment. The Court also DENIES counter-defendant Noorus Sabah Mughal's Motion for Summary Judgment, or in the Alternative, Motion for Summary Adjudication [Docket No. 111], without prejudice, as moot.

**BACKGROUND**

This matter unfortunately has a long, complex, and contentious history.

**I.    The Parties**

    **A.    Plaintiffs**

Muhammad Aslam Mughal, is a Pakistani citizen residing in Toronto, who resided in California under a work visa, until November 2006. Docket No. 1 ¶ 11 (Compl.). He is allegedly

1   unable to return to the United States due to "delays" in renewing his Visa. Docket No. 8 at 1:25-26
2   (Order); *but see infra*, discussion at part II.F. He owns Best Deals on TV ("BDTV"), a California
3   corporation and on-line electronic and consumer product retailer, which has its principal office and a
4   warehouse in Fremont. *Id.* ¶ 7. He also owns 3ZNet, Inc., a California corporation which shares
5   offices with BDTV, which Mughal allegedly closed in October 2006, though he did not dissolve it.
6   *Id.* ¶ 9. He also has an ownership interest in Regalcom, Inc.[1] and Sondos Fund Management, LLC[2]
7   ("Sondos"), discussed in part II.B, *infra*.

### B. Defendants

Mohtashim Naveed was an at-will employee of BDTV and its Vice President, *id.* ¶ 12, Qamar Ali Khan ("Q. Khan"), was an at-will employee of BDTV and its Secretary, *id.* ¶ 13, and, Asmatullah Khan ("A. Khan") and Mian Naeem Uddin were at-will employees of BDTV, *id.* ¶¶ 14-15 (collectively, the "Employees"). Siavash Tehrani is a Danish citizen, who from 2001 through 2007, resided in Dubai, in the United Arab Emirates (UAE). *See* Docket No. 23 at 1 ("Opp'n"); Docket No. 74 ¶ 16 (First Am. Compl. ("FAC")). Shaker Nakhjavani Pour is an Iranian citizen who resides in Dubai, and was Tehrani's partner. Opp'n at 2; FAC ¶ 18. Together they ran Al Kanz General Trading LLC ("Al Kanz"), registered in Dubai. Opp'n at 2; FAC ¶ 17. TSSC FZCO ("TSSC") is a company doing business out of the Jebel Ali Free Zone in the UAE. *Id.* ¶ 19.

### C. Counter-Defendants

Noorus Sabah Mughal is a Pakastani citizen and Mughal's wife. Docket No. 108, attach. 1 ¶ 2 (Counter-Claim ("CC")). Ereczol, Inc. ("Ereczol") is a California corporation which shares offices with BDTV. *Id.* ¶ 3. Naveed Husseini is Mughal's brother-in-law, resides in Hong Kong, and owns Kokonar China, Ltd. ("Kokonar"), a Hong-Kong chartered company. *Id.*

///

///

---

[1]   Due to a dispute over Sondos' ownership, Regalcom's party status is unclear. *See infra* note 5.

[2]   Due to a dispute over ownership, Sondos' party status is unclear. *See infra* part II.E & note 5.

## II. Factual Developments.

### A. 2001

In 2001, Mughal and Tehrani agreed Al Kanz would buy computer and electronic parts from 3ZNet, for sale in Dubai. FAC ¶ 23, CC ¶ 9. That year, Al Kanz wired $4,637,059 to 3ZNet for goods, less $87,443 worth on back-order. *Id.*

### B. 2002

In 2002, Tehrani and Pour wired $804,860 to Mughal for goods and/or refunds of $1,073,751. FAC ¶ 25. Also in this year, Mughal and Tehrani formed Regalcom, each holding 33% and 66% ownership, respectively, to trade electronic parts and engage in other "special projects," such as trading consumer products. FAC ¶ 27; CC ¶ 10. They incorporated it in California, and it shared offices with BDTV. FAC ¶ 8. Tehrani agreed to fund purchases through letters of credit ("LOCs") issued by Dubai banks. *See* FAC ¶ 26; CC ¶ 10. An LOC was then issued for $724,385. *Id.* Mughal, Tehrani, and Pour also formed Sondos, each taking a one-third interest, with the goal of establishing a software company and finding investors for businesses which bought and sold high-end technology and consumer electronics. *Id.* They registered it in California, and it shared offices with BDTV. FAC ¶ 10.

### C. 2003

Mughal allegedly began working on Regalcom's "special projects," which were generally advance orders of computer systems or computer components, such as monitors, central processing units, servers and server systems, hard disc drives, or similar items. *Id.* ¶ 12. Mughal, however, said his businesses could not fund these "special projects," but told Tehrani and Pour that capital could be obtained on a project-by-project basis. *Id.* Tehrani and Pour took out three LOCs, totaling $996,010, and Mughal allegedly sent goods and/or refunds of $1,839,146. FAC ¶ 28. Allegedly, rather than engage in its stated purpose, Mughal had Sondos perform Regalcom's business, to establish a financial "track record," moving $4,095,776 in goods. CC ¶ 11.

In addition, Mughal approached Tehrani and Pour regarding Ereczol, a business he promoted, which bought and sold male enhancement pharmaceuticals. *Id.* ¶ 12. In 2005 and 2006, LOCs were originated by TSSC to Ereczol to allegedly purchase products totaling $3,329,370. *Id.*

**D.    2004**

In 2004, Tehrani and Pour took out ten LOCs and made one wire transfer, totaling $13,369,417, allegedly in exchange for goods and/or refunds totaling $11,253,567. FAC ¶ 29. By 2004, the net difference between credit arranged by Tehrani and Pour for "special projects" and repayments was $3,570,591. CC ¶ 13. The net differential between credit and repayments for the three prior years was $3,572,204, and increased by late 2004. *Id.* ¶¶ 13, 16. When Tehrani and Pour asked if profits from the regular transactions and "special projects" were being used to pay back the LOCs, Mughal allegedly said some of the regular transactions were delayed, and suggested more "special projects" be invested in to generate profits to pay them back. *Id.* ¶ 16.

In June 2004, Customs and Border Protection seized a Regalcom shipment of 100,000 steam cleaners, worth $2.4 million, allegedly because Tehrani and Pour were Iranian citizens.[3] *Id.* ¶ 15. Mughal allegedly told Tehrani he was an American citizen, and to avoid this problem in the future, Tehrani should transfer Regalcom to Mughal by selling his Regalcom shares to Sondos, which Tehrani did. *Id.*; FAC ¶ 30.

**E.    2005**

In this year, Tehrani and Pour opened seven LOCs totaling $9,801,900, allegedly for goods and/or refunds of $10,548,000. *Id.* ¶ 31. Mughal alleges, beginning this year, Tehrani, Pour, Al Kanz, and TSSC (collectively, the "Dubai Defendants") and the Employees (collectively, "Defendants") conspired to steal from him. *Id.* ¶ 32. Allegedly, at this time, Naveed ran Regalcom while Khan[4] ran 3ZNet. *Id.* They then at various times allegedly told Mughal to pay monies owed on the LOCs, when none was owed. *Id.* ¶¶ 33-37. They also allegedly made unauthorized wire transfers. *Id.* ¶¶ 36, 42-44. Mughal also alleges, Tehrani and Pour sold their Sondos shares to him,

///

///

///

---

[3]    The parties do not elaborate or indicate whether any embargoes were involved.

[4]    The pleading does not indicate which Khan.

4

this year, giving him complete ownership. *Id.* ¶ 30. Tehrani and Pour, however, allege Mughal forged the transfer documents. CC ¶ 23.[5]

### F. 2006

In 2006, Tehrani and Pour took out three LOCs totaling $1,708,560, allegedly in exchange for goods and/or refunds totaling $3,958,560. *Id.* ¶ 39.

On November 15, 2006, two FBI agents came looking for Mughal at his Fremont offices, but he was not there. CC ¶ 17. He then told the Employees he was going to Los Angeles, then told them Pakistan, but within a few days, he and his wife moved to Canada. *Id.* Mughal claims from that date, through early 2007, Defendants transferred over $650,000 to themselves, a half million of which was wired to Al Kanz, and issued tax forms indicating Mughal received over $120,000 in 2006 non-employee compensation. FAC ¶¶ 50-66. Mughal also claims during 2005 and 2006, Defendants had induced him to transfer over $1.5 million in unnecessary wires, Defendants had transferred over $1.2 million in unauthorized wires, and they had generated a credit with Al Kanz, in Mughal's favor, of over $2 million. *Id.* ¶ 45.

In contrast, Defendants claim, after Mughal fled, he took business records and checkbooks, and closed many accounts. CC ¶ 19. He also allegedly ordered the Employees to transfer business funds to Kokonar, which they did. CC ¶ 18. He then met with separately with Uddin, in Vancouver, then with Q. Khan near Toronto, told them he wanted to move his businesses to Canada, and tried but failed to persuade them to move their families to Canada, at his expense. *Id.*

On November 17, 2006, Mughal allegedly told Tehrani to come to the United States to meet about a $6 million repayment for the LOCs. *Id.* ¶ 18. He came on November 20, but found Mughal had left. *Id.* Mughal then contacted Tehrani a number of times to extend the meeting date, but never

///

---

[5] Because of this ownership dispute, it is unclear whether Sondos is a plaintiff, *see* FAC at 2, Mot. at 2:9, n.1, or a counter-claimant, *see* CC at 2, Mot. at 2:9, 2 n.2. As it was not sued by plaintiffs, however, the dispute may be whether it is a plaintiff or an intervenor. *See* Fed. R. Civ. P. 13, 24. What is clear, is contrary to Movants' allegations, Sondos is not a counter-defendant, Mot. at 2:9, 2 n.1, as counter-claimants did not sue it, *see* CC at 2. Additionally, however, if Tehrani and Pour each hold one third of Sondos, and Sondos holds all of Regalcom, then they indirectly hold two-thirds of Regalcom. *See* CC ¶ 15; FAC ¶ 30. This would mean Mughal could not bring suit as Regalcom's "sole owner." *See id.* ¶ 8.

met. *Id.* On December 19, Mughal paid Tehrani around $500,000, but never paid the remaining debt. *Id.*

At Tehrani's request, and due to their concerns with Mughal's flight, the Employees checked the financial records for BDTV, Regalcom, 3ZNET, Sondos, and Ereczol. *Id.* ¶ 19. They found of a total 36 LOCs issued, 25 had been drawn against false delivery certificates for non-existent shipments, and 11 involved shipments of substandard or unsalable goods or for misstated quantities. *Id.* Most of the Mughal's "special projects" never occurred, and those that did, were minimally profitable. *Id.* Also, the Mughals had used business funds to buy a house. *Id.* As a result, the Dubai Defendants claim Mughal owed them around $17 million. CC ¶ 22.

### G.     2007

Mughal alleges Defendants transferred over $21,000 to themselves in January. FAC ¶¶ 68-71. On January 11, Mughal terminated the Employees but they allegedly continued to occupy his business offices and access his accounts. Compl. ¶ 37. On February 10, 2007, Mughal hired a new president and CEO for BDTV. *Id.* ¶ 38.

### III.    Procedural Developments

#### A.     Events Prior to the Motion to Withdraw as Counsel.

On March 21, 2007, Mughal, BDTV, Regalcom,[6] 3ZNet, and Sondos[7] (collectively, "Plaintiffs") sued the Employees, alleging violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964, and for various California claims. *See* Docket No. 1 at 1. This same day, Plaintiffs requested a TRO and that the Court set a hearing for a preliminary injunction. *See* Docket No. 4. The next day, the Court denied the former, but set a hearing for the latter. *See* Docket No. 8. The Court then granted a preliminary injunction, on April 12, 2007, ordering the Employees out of the Fremont offices and to turn all business property over to Mughal's counsel. *See* Docket No. 38. On April 19, 2007, the Employees filed a motion to dismiss, *see* Docket No. 40, which the Court denied on June 11, 2007, as Plaintiffs claimed they could amend

---

[6]     *See supra* note 5.

[7]     *See supra* note 5.

1  to cure the alleged defects, *see* Docket No. 54.  The Court thus gave them until June 28, 2007 to file
2  a First Amended Complaint ("FAC").  *Id.*

3  On June 20, 2007, the parties filed a joint case management statement, in which they agreed
4  Plaintiffs could add the Dubai Defendants, the Employees' attorney would accept service for them,
5  and Plaintiffs' attorney would accept service of any pleadings for Mughal.  *See* Docket No. 59. at 7.
6  Also, Tehrani agreed to dismiss a state action he filed against Plaintiffs and to re-file it as a counter-
7  claim.  *Id.* at 9.

8  On June 28, 2007, Plaintiffs filed an FAC against Defendants.  *See* Docket No. 74 at 1.  On
9  July 20, 2007, Defendants filed a Motion to Dismiss.  *See* Docket No. 77.  On September 26, 2007,
10 the Court denied this motion in part and granted it in part, dismissing without prejudice, those
11 portions of FAC alleging bank fraud and fraud in connection with a bank access card.  *See* Docket
12 No. 102.

13 On September 25, 2007, the Court held a CMC, setting pre-trial and trial dates, and referring
14 this matter to early neutral evaluation ("ENE").  *See* Docket No. 103.  On October 26, 2007,
15 Defendants answered the FAC, *see* Docket No. 108 at 1-2, and the Dubai Defendants and Sondos[8]
16 (collectively, "Claimants") filed a counter-claim against Plaintiffs and Ereczol, Noorus Mughal,
17 Husseini, and Kokonar, raising state claims such as breach of contract, fraud, *et seq.*, *see* CC at 1.
18 Then, on December 4, 2007, Noorus Mughal filed a motion for summary judgment or alternatively,
19 summary adjudication.  *See* Docket No. 111.

20 **B.    The Motion to Withdraw as Counsel**

21 On December 19, 2007, John Perkins, Esq. filed a motion to withdraw as counsel for the
22 Employees and Claimants[9] (collectively, the "Clients").  *See* Docket No. 112.  In it, he declared that
23 all his Clients signed agreements stating they would pay him an hourly rate, and if they failed to
24 cooperate with litigation, he could withdraw.  *Id.* at 2 (Decl. of John Perkins)).  Also, he declared
25 that Tehrani, as the owner of Al Kanz, part owner in Sondos, and indirectly, part owner of

---

[8]  Due to the ownership dispute, Sondos apparently filed a counter-claim against itself and its wholly-owned subsidiary.  *See supra* note 5.

[9]  He also claimed to represent TSSC General Trading LLC, but this entity is not a party.

7

1 Regalcom, and as an investor in Mughal's businesses, was Perkins' point of contact for the other
2 clients, and that his involvement was critical to prosecuting this matter. *Id.*

3 On October 18, 2007, however, Tehrani told Perkins, he had to leave the UAE due to
4 demands from the banks that funded the LOCs. *Id.* He also told Perkins he could no longer assist
5 with this litigation, nor would he communicate with him. *Id.* Repeated efforts by unidentified
6 others to bring him back to the litigation or to get him to communicate with Perkins were
7 unsuccessful. *Id.* As for Pour, he does not speak, read, or write English. *Id.* Nor did he generally
8 respond to any inquiries, and to those he did, he was not timely. *Id.* Nor had either Tehrani or Pour
9 paid his most recent bill. *Id.* at 4. Thus, he warned them in writing of the possible adverse
10 consequences of his withdrawal. *Id.*

11 As for the Employees, who Perkins billed separately, they did not respond to his
12 communications, nor pay him, even though he spent substantial time on their law and motion issues.
13 *Id.* He warned them in writing of the possible adverse consequences of his withdrawal. *Id.* Because
14 discovery was ongoing, and an ENE and a motion for summary judgment were pending, Perkins
15 declared he could not continue to represent any of the Clients without their input or compensation.
16 *Id.* Lastly, he served each of them with his moving papers, at their last known address, which he
17 provided to the Court. Mot. to Withdraw at 3.

18 The Court granted his motion on January 17, 2008. *See* Docket No. 123-24. In so ruling, the
19 individual defendants were advised to obtain new counsel or familiarize themselves with the local
20 rules and this Court's standing orders. Docket No. 124 at 1:14-16, 2:4-6. The Court also warned the
21 business entity defendants they could not appear pro se and had to retain counsel or risk default
22 judgment against them. *Id.* at 2:2-3. All defendants were given 45 days to obtain counsel, and were
23 warned with or without counsel they still had to respond to discovery requests. *Id.* at 1:14-17. Also,
24 under Civil Local Rule 11-5(b), the Court ordered Perkins to forward all papers "for the next 45
25 days or until the [Clients] appear by other counsel or pro se." *Id.* at 2:8-9. Lastly, the Court vacated
26 all pre-trial and trial dates. *Id.* at 2:11-12.
27 ///
28 ///

1    **C.    Events Subsequent to the Motion to Withdraw as Counsel**

On January 9, 2008, Plaintiffs filed a Motion to Compel Defendants to Produce Documents and Appear for Depositions. *See* Docket No. 115. In this motion, Plaintiffs alleged they had propounded requests for the production of documents and deposition notices in August and October 2007, to the Dubai Defendants and Khan,[10] none of whom had responded. *Id.* The next day, the Court referred all discovery matters to a magistrate judge. *See* Docket No. 116. Plaintiffs withdrew this motion on March 5, 2008. *See* Docket No. 126.

On March 5, 2008, Stan Dale Blyth, Esq. filed a notice of appearance for the Employees. *See* Docket No. 126. On March 26, 2008, the represented parties' counsel had a conference call with an ADR staff attorney, who indicated she would recommend this matter be removed from ENE. *See* Docket No. 139 at 3:1-8.

On April 2, 2008, the Court held a CMC, at which the Dubai Defendants did not appear. Mot. at 4:27-28. On April 14, 2008, Plaintiffs and Mughal's wife (collectively, "Movants") filed the Motion seeking to dismiss the counter-claim and for a default judgment against the Dubai Defendants. *See id.* at 1. On April 5, 2008, Movants mail served the Motion and all its related papers on these defendants at their last known addresses, as provided by Perkins in his motion to withdraw. *See* Docket No. 135. In their Motion, Movants argue these defendants have failed to prosecute their counter-claim, by failing to participate in discovery or obtain counsel, or appear at the most recent CMC, and thus the Court should dismiss it under Rule 41(b) and (c). *Id.* at 5:2-22. They also argue the Court should enter a default judgment against these defendants for the same reasons. *Id.* at 5:24-6:21.

**LEGAL STANDARD**

**I.    Dismissal under Federal Rule of Civil Procedure 41(b)**

Federal Rule of Civil Procedure 41(b) states, in part, "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any case against it." Fed. R. Civ. P. 41(b). The term "plaintiff" includes a counter-claimant. Fed. R. Civ.

---

[10]    Plaintiffs do not indicate which Khan.

9

1  P. 41(c). Nonetheless, "[d]ismissal is a harsh penalty and is to be imposed only in extreme
2  circumstances." *Henderson v. Duncan*, 779 F.2d 1421, 1423 (9th Cir. 1986).

> [A] district court [is] required to weigh several factors in determining whether to dismiss [a] case for lack of prosecution: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits and (5) the availability of less drastic sanctions.

*Id.*

In addition, a court must provide "warning of imminent dismissal of the case." *Oliva v. Sullivan*, 958 F.2d 272, 274 (9th Cir. 1992).

## II.     Entry of Default and Default Judgment under Federal Rule of Civil Procedure 55

Obtaining a default judgment requires a movant first obtain the entry of default, Fed. R. Civ. P. 55(a), and then simultaneously or subsequently obtain the entry of a default judgment, *id.* 55(b).

### A.     Entry of Default

Federal Rule of Civil Procedure 55(a) states, "(a) *Entering a Default.* When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." In the alternative, a movant may request the entry of default from the Court. *Breuer Elec. Mfg. v. Toronado Sys. of Am., Inc.*, 687 F.2d 182, 185 (7th Cir. 1982). Where a defendant demonstrates a clear purpose to defend themselves, a court may not enter default against them. *Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 689-90 (9th Cir. 1988).

### B.     Entry of Default Judgment

As a matter of public policy, default judgments are generally disfavored, as cases should be decided on their merits if possible. *In re Roxford Foods, Inc.*, 12 F.3d 875, 879 (9th Cir. 1993); *Direct Mail*, 840 F.2d at 689; *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986); *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985). Nonetheless, if a plaintiff has a claim for a "sum certain," they may request the Clerk of the Court enter a default judgment against a plaintiff. Fed. R. Civ. P. 55(b)(1).

> In all other cases, the party must apply to the court for a default judgment....
> If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 3 days before the hearing.  The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to:  (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter.

Fed. R. Civ. P 55(b)(2).

A failure to satisfy Rule 55(b)(2)'s notice requirement is a serious procedural error usually justifying reversal on appeal or the setting aside of a default. *Roxford*, 12 F.3d at 879; *Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141 (9th Cir. 1989); *Wilson v. Moore & Assocs., Inc.*, 564 F.2d 366, 370 (9th Cir. 1977).

An application for default judgment should establish the grounds for default judgment, such as a defendants's failure to appear or to defend, Fed. R. Civ. P. 55(a); the date default was entered, *see id.*; the defendant's state of competency, *id.* 55(b) ; the defendant's military status, if he or she has not appeared, 50 U.S.C. App. § 521; how the applicant provided proper notice, if the defendant has appeared, Fed. R. Civ. 55(b)(2); and if the amount claimed is unliquidated, a declaration of damages, and proof the defendant has received notice of this declared amount, *see id.*, *e.g.*, C.D. Cal. L.R. 55-1, 55-2.

The decision whether to grant or deny a request for default judgment rests entirely in the Court's discretion. *Draper v. Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092-93 (9th Cir. 1980) (per curiam); *Eitel*, 782 F.2d at 1471.  The factors a court *may* consider include:  (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.  *Eitel*, 782 F.2d at 1471-72.

In the event a plaintiff seeks a default judgment against less than all defendants, or if their matter involves joint liability, vicarious liability, or severally liable defendants with similar defenses, the movant must address the policies which generally counsel against default judgment in such cases, to avoid inconsistent results or inequitable awards. *See* Fed. R. Civ. P. 54(b) (In multi-defendant matter, any judgment for less than all defendants is interlocutory, unless court expressly determines there is no just reason for delay in entering final judgment for less than all defendants.); *Frow v. De La Vega*, 82 U.S. 552, 554 (1872) (joint); *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532 (9th Cir. 2001) (joint or similarly situated); *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1458-59 (5th Cir. 1992) (vicarious); *Pac. Info. Res., Inc. v. Simple Commc'n*, C-07-4131 MMC, slip op., 2008 WL 906431, *1 (N.D. Cal. Apr. 1, 2008) (similarly situated or vicarious); *RPA Intern. Pty Ltd. v. Compact Intern., Inc.*, 06CV1147WQHAJB, slip op., 2008 WL 281174, *3-*4 (S.D. Cal. Jan. 31, 2008) (multiple defs.); *In re Meyer*, 373 B.R. 84, 91-92 (B.A.P. 9th Cir. 2007) (Klein, J., concurring) (multiple defs.); *Newman v. McGrath*, C06-05931 SBA, 2007 WL 1033473, *2 (N.D. Cal. Apr. 4, 2007) (unreported) (similarly situated); *Shanghai Automation Instrument Co., Ltd. v. Kuei*, 194 F.Supp.2d 995, 1005-10 (N.D. Cal. 2001) (multiple defs.).

## ANALYSIS

**I.  The Court dismisses the counter-claim under Rule 41(b).**

In their Motion, Movants failed to provide the Court with an analysis of the *Henderson* factors. Nonetheless, under these factors, based on the facts presented, dismissal of the counter-claim with prejudice is warranted.

Turning to the first *Henderson* factor, the public's interest in the expeditious resolution of the October 26, 2007 counter-claim, the Court notes Tehrani and Pour control its prosecution, as they entirely control the business counter-claimants Al Kanz and TSSC, and two-thirds control the business counter-claimant Sondos. According to Perkins' declaration, Tehrani expressly stated on October 18, 2007, he would no longer participate in this litigation,[11] and is believed to currently reside in Denmark. As for Pour, Perkins declared he cannot speak, read, or write in English, and

---

[11]  Perkins, however, never explains why he filed the counter-claim eight days *after* Tehrani said this.

12

1  essentially would not communicate with him, nor was he cooperative with prosecuting the counter-
2  claim.  He apparently resides in the UAE.  Thus, the five Claimants have indicated they do not
3  intend to prosecute their counter-claim.

4        This conclusion is confirmed by the fact subsequent attempts by third-parties were
5  unsuccessful in getting Tehrani to change his mind or to get Pour more involved in this matter.  In
6  addition, Claimants have never taken any discovery in their counter-suit, nor filed any pleadings
7  after their counter-claim, nor appeared at any hearings since Perkins withdrew almost five months
8  ago.  The Court finds Claimants' delay unreasonable, such that their failure to prosecute has
9  interfered and will interfere with the public's interest in the expeditious litigation of their counter-
10 claim, absent dismissal.  *See Hernandez v. City of El Monte*, 138 F.3d 393, 400 (9th Cir. 1998).
11 Thus, this first *Henderson* factor favors dismissal of the counter-claim.

12       Turning to the second *Henderson* factor, the Court's need to manage its docket, the Court
13 notes Claimants' unreasonably delay in prosecuting their counter-claim, has also delayed this entire
14 matter, which cannot be stayed indefinitely until Claimants decide to prosecute their counter-claim.
15 Thus, for the same reason the Court found Claimants' delay unreasonable and an impediment to
16 expeditiously resolving their counter-claim, it also finds their delay an impediment to its ability to
17 manage its docket.  Thus, the second *Henderson* factor favors dismissal.

18       With regards to the third *Henderson* factor, the risk of prejudice to counter-defendants, "the
19 law will presume injury if the [counter-claimant] has caused unreasonable delay."  *Hernandez*, 138
20 F.3d at 401.  Here, Claimants have caused unreasonably delay.  Prejudice is thus presumed as a
21 matter of law.  Absent any rebuttal by Claimants, the presumption stands.  Thus, the third *Henderson*
22 factor favors dismissal.

23       As for the fourth *Henderson* factor, the public policy favoring the resolution of cases on their
24 merits generally counsels against dismissal.  *Hernandez,* 138 F.3d at 401.  Here, however, where
25 Claimants have expressly by word and/or act withdrawn from their counter-claim *even before it was*
26 *filed*, it is difficult for the Court to conceive how it could be resolved on the merits.  Thus, the fourth
27 *Henderson* factor favors dismissal.

28 ///

Lastly, in regards to the fifth *Henderson* factor, the availability of less drastic sanctions, the Court is unable to consider any, as Claimants have withdrawn from this litigation, failed to respond to the mail-served Motion requesting dismissal of their counter-claim, and apparently will not communicate with the Court. All this despite warnings from Perkins as to the adverse consequences of his withdrawal, and this Court's admonition they could be defaulted if they did not participate in this matter. Thus, the Court is uncertain as to what less drastic sanctions it could impose, or how to communicate them to Claimants, or even effectively enforce them. Thus, the fifth *Henderson* factor favors dismissal.

Because all five *Henderson* factors favor dismissal, the Court GRANTS the Motion and dismisses Claimants' counter-claim with prejudice.[12]

## II. The Court will enter a default against Tehrani, Pour, Al Kanz, and TSSC under Rule 55(b)(1).

Movants have requested a default judgment against the Dubai Defendants, but have not requested the entry of default against them. The latter, however, is a mandatory predicate for the former. Fed. R. Civ. P. 55(a)-(b). Nonetheless, the Court will interpret the request for a default judgment as including one for entry of default. *See Breuer Elec. Mfg.*, 687 F.2d at 185. In this case, an entry of default is appropriate as declarations indicate the Dubai Defendants have expressly indicated by words and/or action they do not intend to defend themselves, and have not defended themselves. As already noted, Tehrani expressly indicated his withdrawal on October 18, 2007, prior to the Dubai Defendants answering the FAC. Pour withdrew by his failure to respond to Perkins' inquiries. Also, since Perkins withdrew on January 17, 2008, the Dubai Defendants have not participated at all in this matter. Thus, they have not demonstrated "a clear purpose to defend themselves, [such that the C]ourt may not enter default against them." *Direct Mail*, 840 F.2d at 689-90.

///

---

[12] This dismissal, however, only applies to Claimants, and does not affect in any way Employees' right or ability to raise in their defense any of the defenses or allegations raised in the dismissed counter-claim.

14

1  Further, there are no administrative barriers to entry.  Although not required for *entry*,
2 Plaintiffs mail-served the Dubai Defendants with the Motion requesting a default judgment against
3 them, which served to notice them the Court could *enter* default against them.  Further, when
4 Perkins withdrew, the Court warned the Dubai Defendants in its order, which was mail-served on
5 them, that if they did not participate in this litigation, they could be defaulted.  The Court also gave
6 them 45 days to retain counsel, mandatory for Al Kanz and TSSC, which the Court advised the
7 Dubai Defendants could not appear pro se.  Further, there is no evidence before the Court to suggest
8 any of the Dubai Defendants are legally incompetent.  *See* Fed. R. Civ. P. 55(b)(1).  Thus, the Court
9 GRANTS Movants' motion to enter default against the Dubai Defendants, on the FAC.

**III.  The Court will not enter a default judgment against Tehrani, Pour, Al Kanz, and TSSC under Rule 55(b)(2).**

Although Movants have requested the Court enter a default judgment against the Dubai Defendants, they have not presented any legal analysis under the *Eitel* factors explaining why such a disfavored remedy should be provided here.  Further, they have not made any attempt to verify their compliance with the procedural requirements of Rule 55(b)(2).  And lastly, they have made no attempt to meet their very heavy burden here, to explain how the Court could enter a default judgment against only half the members of an alleged conspiracy, without working an inequity on the other alleged half, who are actively litigating this matter.  *See Frow v. De La Vega*, 82 U.S. at 554.  Thus, the Court DENIES without prejudice Movants' Motion for a default judgment against the Dubai Defendants.

**CONCLUSION**

Accordingly, the Court GRANTS in part and DENIES in part the Motion to Dismiss Counterclaim for Failure to Prosecute and Failure to Comply with Court Orders; and Request to Enter Default against Certain Defendants and Counter-Claimants (the "Motion") [Docket No. 131]. Specifically:

(1)  The Court GRANTS the motion to dismiss with prejudice the Counter-Claim.  Thus, the Court DISMISSES with prejudice the Counter-Claim [Docket No. 108, attach. 1] and counter-

///

defendants Best Deals on TV, Inc., Regalcom, Inc., 3Znet, Inc., Muhammad Aslam Mughal, Noorus Sabah Mughal, Ereczol, Inc., Naveed Husseini, and Kokonar China, Ltd.;

(2) The Court GRANTS the motion to ENTER A DEFAULT against defendants Siavash Tehrani, Shaker Nakhjavani Pour, Al Kanz General Trading LLC, and TSSC FZCO, on the First Amended Complaint [Docket No. 74];

(3) The Court DENIES without prejudice the motion to enter a default judgment against defendants Siavash Tehrani, Shaker Nakhjavani Pour, Al Kanz General Trading LLC, and TSSC FZCO; and

(4) The Court DENIES without prejudice counter-defendant Noorus Sabah Mughal's Motion for Summary Judgment, or in the Alternative, Motion for Summary Adjudication [Docket No. 111], as moot.

IT IS SO ORDERED.

June 17, 2008

_Saundra B Armstrong_
Saundra Brown Armstrong
United States District Judge